NOT DESIGNATED FOR PUBLICATION

No. 115,009

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of P.T.,
A Minor Child Under the Age of Eighteen.

MEMORANDUM OPINION

Appeal from Shawnee District Court; STEVEN R. EBBERTS, judge. Opinion filed March 17, 2017.
Affirmed.

*John Paul D. Washburn*, of Topeka, for appellant.

*Kendall Kaut*, assistant district attorney, and *Chadwick J. Taylor*, district attorney, for appellee.

Before GARDNER, P.J., PIERRON and ATCHESON, JJ.

*Per Curiam*:  Father, D.T., appeals the termination of his parental rights to his
child, P.T. On appeal, Father argues:  (1) clear and convincing evidence did not exist to
find that he was unfit under K.S.A. 2015 Supp. 38-2269; and (2) the court abused its
discretion when it found that the termination of his parental rights was in the best
interests of P.T.

Various factors under K.S.A. 2015 Supp. 38-2269 were proved by clear and
convincing evidence to support the finding that Father was unfit. It was in the best
interests of P.T. to terminate Father's rights. The district court did not abuse its discretion
and is affirmed.

Father and Mother are the parents of P.T. (born 2011). On May 18, 2012, Amber
Love of the Kansas Department of Children and Families (DCF) was assigned to an

1

investigation involving P.T. It had been reported that Mother, who was 32 weeks pregnant, had tested positive for methamphetamine and ecstasy at a prenatal appointment. Love met with Mother who admitted to using methamphetamine. Love asked Mother to take a hair test, but she refused. Mother took a urinalysis test, and the results were negative. The child tested positive for amphetamines when it was born. Due to Mother's substance abuse, the State requested custody of the newborn and P.T.

The State filed a petition on May 18, 2012, to find P.T. to be a child in need of care. On May 22, 2012, the district court held a temporary custody hearing. The court found an emergency existed and placed P.T. in the custody of DCF. Father tested positive for THC on the day of the hearing. At the time P.T. was removed from the home, she was 13 months old.

Kimberly Williams, a family support worker through KVC, started on P.T.'s case at the time of the referral on May 18, 2012. Her role was to work directly with the clients to ensure that visitation was done, case plan tasks were being met, and P.T.'s needs were being met. Case plan meetings were held every 5 months.

The first case plan required Father to complete a RADAC assessment, which determines if drug and alcohol treatment is needed. He was also to follow all of the recommendations from the assessment. Father was also required to attend Narcotics Anonymous (NA). In the petition there was concern that Father had drug abuse issues. In addition to the drug related tasks, Father was to obtain stable housing and provide proof of a stable source of income. The ultimate goal of the first case plan was reintegration.

The second case plan was developed on October 24, 2012. Father did not attend this case plan meeting. He had not completed a RADAC assessment and had not attended NA. He was placed on the color code system for urinalysis tests. Father had failed to

provide paperwork that proved he had employment. This case plan added the task that Father maintain contact with the agency because he had failed to do so.

The third case plan was developed on March 22, 2013. Father did not show up for this case plan meeting. He had completed a RADAC assessment, but he was required to have a new one completed because he had tested positive for illegal drugs. Father still had not provided proof of a legal source of income, and he had not attended NA.

The fourth case plan was developed on August 30, 2013. Father had not updated his RADAC assessment after his positive drug test. The new case plan had an additional task to keep the utilities on in the home. At this time, Father and Mother were living together and Williams wanted to know whether she needed to provide resources to the family to help them pay for utilities so they would not be shut off. Williams recommended family therapy because of separation issues P.T. had with visitation. Father and Mother were not consistent with their visitations which caused problems for P.T. Williams was informed by P.T.'s daycare provider that if Father and Mother missed a visit, P.T. would be a mess the rest of the day. Williams testified that an extra emphasis is placed on the importance of visitation when it is a young child because of attachment issues and emotional concerns.

The fifth case plan was developed on September 30, 2014. Again, Williams wanted Father to complete a new RADAC assessment because he had a positive drug test. In Williams' experience when referring parents to receive a RADAC assessment, an appointment can be made and completed within a week. At most, it could take 2 weeks. Father still had not provided proof of stable housing or proof of employment. A new case plan task was added to require Father and Mother to attend all meetings and court hearings regarding P.T. including case plans, school meetings, parent visits, and court proceedings. At this juncture, Father and Mother had trouble maintaining contact with KVC.

3

The sixth case plan was developed on November 4, 2014. Father had all the same issues as before including no RADAC assessment and no proof of housing. At the time, Father was living in a trailer. No walk through of the trailer had been completed because when Williams went there Father either was not at home or he would come outside to talk with her. From what Williams could see when standing outside the trailer, it was in disarray and would not have been an appropriate placement for a child. In addition, the trailer had no running water. Father and Mother had a previous housing concern when they were evicted from their home in April 2014. Overall, Father had three different addresses during the case. Williams testified that stable housing does not mean three or four moves over the period of 2 years. Moving constantly would cause emotional issues for P.T. Being "bounced around" had affected her emotional state and visits were very hard for her.

The most recent case plan meeting occurred on March 31, 2015. Williams still requested a RADAC assessment, drug tests, proof of housing, and proof of income. She had not met with Father since February. Williams still wanted Father to attend NA because there were concerns about diluted urinalyses tests. When Williams was in Father's home, she asked for a drug test. As Father walked to the bathroom something fell from of his pant leg. Williams picked it up, smelled it, and it appeared to be a bottle of urine. When Father took his drug test it was positive.

Williams had concerns that Father was not being truthful on his RADAC assessment. Father stated the last time he used THC was in 2000, but a drug test from May 22, 2012, tested positive for THC. The RADAC assessment occurred on July 23, 2012, which was after the positive drug test. In addition, Father had a hair drug test on May 15, 2015, that read 19,930 for methamphetamine, which is considered excessively high. A result of 7,500 indicates frequent usage, and a number that is higher indicates more severe usage. However, on his RADAC assessment he stated he had not used

4

methamphetamine since July 2014. Lastly, Father indicated he last used alcohol in 2011. But, he had tested positive for alcohol on June 26, 2012. Based on Father's answers to the evaluation questions, his recommendation from the RADAC assessment was for no treatment.

Under all of the case plans, Father was required to take random drug tests under the color code system. While he did complete drug treatment at Valeo, Father tested positive for various drugs throughout the course of the case and missed several drug tests:

May 22, 2012: positive for THC;

May 31, 2012: positive for methamphetamine and THC;

June 12, 2012: positive for methamphetamine and alcohol;

June 26, 2012: positive for alcohol;

April 26, 2013: no show;

April 30, 2013: no show;

May 2, 2013: no show;

May 7, 2013: no show;

August 8, 2013: positive for THC;

August 23, 2013: positive for methamphetamine, amphetamine, and THC;

August 28, 2013: positive for THC;

October 2, 2013: positive for methamphetamine, amphetamine, and THC;

June 5, 2014: hair test, positive for methamphetamine, amphetamine, and THC;

May 15, 2015: hair test, positive for methamphetamine, amphetamine, and THC.

Father also tested positive for ecstasy, methamphetamine, amphetamines, and THC on August 20, 2015, which was during the termination trial. Previously he served 12 days in jail for narcotics charges and was given probation in Jackson County.

Father's last visit with P.T. was on October 6, 2014, because her therapist, Gail Gardner-Sparkman, recommended to hold visits due to P.T.'s emotional state. P.T.

5

struggled after visits and cried inconsolably. While Father interacted well with P.T. during visits, his first visit was not until June 2013 because he did not maintain contact with the agency. His visits were from June 2013 to October 2014. When visits stopped with Father, the case plan had changed to adoption, but if he had consistently clean drug tests and hair tests and completed the other assigned tasks, the plan could have changed to possibly begin visitation again. There was an allegation from P.T. that Father pulled her hair, threw her off the bed, and hurt her skin; however, that allegation was unsubstantiated.

Gardner-Sparkman, a licensed clinical social worker and registered play therapist, testified that after visits with the parents, P.T. was distressed, very unhappy, struggled to sleep, and regressed in toilet training. When visits with the parents ceased, P.T. was calm and acted like a normal child of her age. Family therapy was in place early in the case with Gardner-Sparkman; however, it stopped when the family moved and she had no knowledge of where they went. While Father communicated that he wanted family therapy to resume, Williams said she had not been able to have a phone conversation or meet with him since February 2015. At one point she could not get in contact with Father because his phone had been shut off.

Williams testified it was in P.T.'s best interests to have both Mother and Father's rights terminated. The guardian ad litem joined in this recommendation. P.T. did well with her foster family, and they were willing to adopt her. The foster family had both of P.T.'s siblings as well. P.T. has been in custody from 13 months to 4 1/2 years of age, and has been placed with the foster family for a year and a half.

After the trial, the district court issued a written ruling and found both Mother and Father were unfit and terminated their parental rights. The court found the evidence clearly and convincingly demonstrated the parents did not comply with the case plans and the primary issues from the beginning of the case were still ongoing. While there was

some level of progress, the tasks were never completed or maintained. The district court raised the question, "how long is [P.T.] to wait before Parents complete their case plan tasks?"

Under K.S.A. 2015 Supp. 38-2269(b)(3), the district court found both parents continued to excessively use dangerous drugs, which made them unable to properly care for P.T. Father's continued use of illegal drugs had resulted in an arrest and incarceration. The consistent use of illegal drugs, the nature of the drug usage, and the inability to remain sober made both parents unable to care for the needs of P.T. In addition, their drug usage had prevented them from reintegration.

Next, the district court looked to K.S.A. 2015 Supp. 38-2269(b)(4) and found the parents' actions and inactions constituted physical, mental, or emotional neglect of P.T. In addition to their inability to remain sober, their use of illegal drugs had a direct impact on P.T. Father did not make contact with the agency until months after P.T. was taken into custody. Parents were not consistent with visitation. The agency workers told the parents to work hard to keep visits because of attachment issues with P.T. In total, more than half of P.T.'s life had been spent outside either of her parents' homes. When visits were ongoing, P.T. would become angry, upset, distressed, and rebellious. When visits ceased, P.T. became stable.

The district court then found under K.S.A. 2015 Supp. 38-2269(b)(7), despite reasonable efforts made by the agency to rehabilitate the family, such efforts had failed. Efforts offered by the agency included: Therapeutic Case Management and Family Support Worker services; worker/parent and worker/child visits; assessment of safety and family concerns; clothing allowance; transportation for P.T. to visits and appointments; medical card; random drug tests; family therapy; utility assistance; referrals to RADAC; referrals to vocational rehabilitation; referrals to Topeka Housing Authority; offers to assist with the appeal of the Topeka Housing Authority denial; referrals to Parents as

7

Teachers; and referral for Father to Cornerstone and to Catholic charities for rent assistance.

Next, under K.S.A. 2015 Supp. 38-2269(b)(8), the district court found both parents demonstrated a lack of effort to adjust their circumstances, conduct, or conditions to meet the needs of P.T. In addition, under K.S.A. 2015 Supp. 38-2269(c)(1), the parents had failed to assure care of P.T. in the parental home when able to do so. The parents did not abstain from illegal drugs and did not maintain sobriety throughout the course of the case. Both parents failed to participate or complete treatment. They both failed to participate or engage in services offered from agency workers. They also failed to maintain stable and suitable housing and provide employment verification. Lastly, they failed to maintain consistent visitation with P.T. when able to do so.

Under K.S.A. 2015 Supp. 38-2269(c)(2), the district court found Father had failed to maintain regular visitation, contact, or communication with P.T. In November 2012, he did not participate in case planning and only contacted the agency once. In January 2013, he had not asked for visitation. As the case continued, there was a lack of consistent contact with the agency. Father's first visit was not until June 2013. His inconsistent visitation contributed to P.T.'s problems adjusting after visits.

Lastly, the district court found that under K.S.A. 2015 Supp. 38-2269(c)(3), both parents had failed to carry out a reasonable plan approved by the court directed toward reintegration. P.T. had been in out-of-home placement since May 18, 2012, and the parents had not complied with the court-ordered reintegration plan. The parents maintained the same case plan tasks for more than 3 years and failed to abstain from illegal drugs, provide adequate housing, and provide verification of income to support P.T.

8

Ultimately, the district court concluded valid concerns for P.T.'s emotional stability existed and that she liked being in her current placement. While the parents had more than 3 years to comply with their court ordered plan, P.T. had moved on with her life. The court then found that both parents were unfit and their condition or conduct was unlikely to change in the foreseeable future. Next, it found the termination of parental rights was in the best interests of P.T. "because the parents are not now, nor will ever be, capable of providing a level of care sufficient to her emotional, physical, and psychological health."

On appeal, Father argues the district court erred in finding he was unfit; and the court erred in finding that it was in P.T.'s best interests that his rights be terminated.

The district court found that Father was an unfit parent pursuant to K.S.A. 2015 Supp. 38-2269. In order to make this finding, the district court must find by clear and convincing evidence the parent is unfit and shall consider, but is not limited to, the following:

"(1) Emotional illness, mental illness, mental deficiency or physical disability of the parent, of such duration or nature as to render the parent unable to care for the ongoing physical, mental and emotional needs of the child;

"(2) conduct toward a child of a physically, emotionally or sexually cruel or abusive nature;

"(3) the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child;

"(4) physical, mental or emotional abuse or neglect or sexual abuse of a child;

"(5) conviction of a felony and imprisonment;

"(6) unexplained injury or death of another child or stepchild of the parent or any child in the care of the parent at the time of injury or death;

"(7) failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family;

9

"(8) lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child; and

"(9) whether the child has been in extended out of home placement as a result of actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply." K.S.A. 2015 Supp. 38-2269(b).

Here, the district court found Father was unfit to parent under factors 3, 4, 7, and 8. Each factor will be examined individually.

Under factor 3, Father argues clear and convincing evidence did not exist because he did not have any positive drug tests in 2014 and 2015. In addition, Williams testified Father did not exhibit any of the traditional signs of methamphetamine use and was not inappropriate during his visits with P.T. Father relies on several cases that state drug concerns and positive drug tests do not amount to a child in need of care finding. *In re L.C.W.*, 42 Kan. App. 2d 293, 299-304, 211 P.3d 829 (2009); *In re A.M.*, No. 106,890, 2012 WL 2925660, at *7 (Kan. App. 2012) (unpublished opinion).

The district court relied on clear and convincing evidence when it found Father's continued use of illegal drugs throughout the pendency of the case made him unable to care for the needs of P.T. and prevented reintegration. Father claims he did not have any positive drug tests in 2014 and 2015; however, in both those years a hair test was conducted and came back positive for methamphetamine, amphetamine, and THC. The hair test in 2015 came back with a methamphetamine count of 19,930. This is considered excessively high, as a number of 7,500 indicates frequent usage. In addition, Father was positive on August 20, 2015, at trial, for ecstasy, methamphetamine, amphetamine, and THC. From 2012 to 2015, Father periodically tested positive for THC, methamphetamine, alcohol, amphetamine, and ecstasy. Lastly, he served 12 days in jail for narcotics charges and was given probation.

Father argues drug concerns and positive drug tests do not amount to a child in need of care finding. Father's drug usage continued over the entire case, resulted in incarceration, and proved to be severe usage with the 2015 hair test. This is also not the only factor the district court relied on to make its finding. Based on the evidence, the court had clear and convincing evidence to find Father's use of illegal drugs kept him from reintegrating with P.T.

Under factor 4, the district court had clear and convincing evidence that Father's actions and inactions established physical, mental, or emotional neglect of P.T. Father argues the court failed to connect his actions with the abuse of P.T.

Father failed to remain sober over the entirety of the case. He failed to make contact with the agency until months after P.T. was taken into custody and was not consistent with his visitation. After visits with her parents, P.T. was distressed, unhappy, struggled to sleep, and regressed in toilet training. When visits ceased, P.T. was calm and acted like a normal child of her age. It is clear from P.T.'s behavior, as well as Father's problems during the case, that clear and convincing evidence supports the district court's findings under factor 4.

Under factor 7, Father argues that the reasonable efforts offered by the agency were mainly directed toward the Mother and P.T., not toward assisting him. However, several of these efforts were offered that involved Father, including Therapeutic Case Management and Family Support Worker services, assessment of safety and family concerns, transportation for P.T. to visits, random drug tests, family therapy, utility assistance, referrals to RADAC, and referral to Cornerstone and to Catholic Charities for rent assistance. Further, KVC is not required to exhaust all their resources to rehabilitate a parent, and a "herculean effort" is not required for a court to find a parent unfit. *In re S.C.*, No. 107,950, 2012 WL 5392188, at *3 (Kan. App. 2012) (unpublished opinion)

11

(citing *In re B.K.S., Jr.*, No. 95,297, 2006 WL 2443937, at *2 [Kan. App. 2006] [unpublished opinion]). Clear and convincing evidence supports this factor.

Under factor 8, Father argues he maintained constant visitation when it was not suspended. In addition, he argues he asked for family therapy and he maintained housing throughout the case. The court found both parents demonstrated a lack of effort to adjust their circumstances, conduct, or conditions to meet the needs of P.T. in several areas. First, the parents failed to maintain sobriety and were unable to abstain from illegal drugs. Father tested positive for various substances from 2012 to 2015. Next, both parents failed to participate or complete treatment. Father was asked to complete a RADAC assessment on nearly every case plan, and when he did complete the assessment he was not truthful.

The parents failed to participate in services offered from the agency workers. This is demonstrated from all the efforts offered above and the continued lack of participation and completion on part of the parents. Next, they failed to maintain stable and suitable housing and provide employment verification. Father had three different addresses during the case. Both parents were evicted from one home in April 2014. When Father lived in a trailer, Williams was not able to be complete a walk-through inspection, but she saw the inside was in disarray and did not have running water. Proof of employment was never provided.

Also under factor 8, the parents failed to maintain consistent visitation with P.T. when able to do so. Father did not have his first visit until June of 2013 because he had not maintained contact with the agency. When he did visit with P.T., he interacted well, but his visits were only from June of 2013 to October of 2014. Based on all of the information, the district court had clear and convincing evidence for its finding under factor 8.

12

The district court then looked at the factors under K.S.A. 2015 Supp. 38-2269(c). This statute states that when a child is not in the physical custody of the parent, the court shall consider, but is not limited to:

"(1) Failure to assure care of the child in the parental home when able to do so;

"(2) failure to maintain regular visitation, contact or communication with the child or with the custodian of the child;

"(3) failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home; and

"(4) failure to pay a reasonable portion of the cost of substitute physical care and maintenance based on ability to pay." K.S.A. 2015 Supp. 38-2269(c).

Under K.S.A. 2015 Supp. 38-2269(c)(1), the district court relied on the same clear and convincing evidence as for K.S.A. 2015 Supp. 38-2269(b)(8). The inability to maintain sobriety, failure to participate or complete treatment, failure to engage in offered services, failure to maintain suitable housing and provide employment verification, and failure to maintain consistent visitation with P.T. also prove this factor by clear and convincing evidence.

Under factor 2, the district court found Father had failed to maintain regular visitation, contact, or communication with P.T. He argues his visits were consistent. However, he did not participate in the 2012 case plans or contact the agency. In the beginning of 2013 he still had not asked for visitation. Then, as the case continued, there was a lack of consistent contact with the agency, and his first visit with P.T. was not until June of 2013. This factor was met by clear and convincing evidence.

Under factor 3, the district court found that both parents had failed to carry out a reasonable plan approved by the court directed toward reintegration. Father argues he maintained contact with Williams, had employment the duration of the case, maintained housing, and tested negative for a majority of his drug tests. However, P.T. had been in

13

out of home placement since May 18, 2012, and Father had not complied with the reintegration plan. He maintained the same tasks in each case plan over the course of 3 years and failed to abstain from illegal drugs, failed to provide proof of adequate housing, and failed to provide verification of income. Based on the failure to complete the same case plan tasks over a 3-year period, this factor was met with clear and convincing evidence.

Father argues the district court did not assess within its findings of fact or conclusions of law whether his conduct or condition was likely to change in the foreseeable future. He states the history of the case demonstrates he always had housing, employment, and the necessary parenting skills that P.T. needed.

When determining how to define "foreseeable future," the district court examines the term from the perspective of a child. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). Children and adults have different perceptions of time, and a child has the right to permanency within a time frame that is reasonable to them. 50 Kan. App. 2d at 1170. The district court may draw inferences from the past conduct of a parent to determine that the parent's conduct will not likely change in the foreseeable future. *In re Z.C.*, No. 97,032, 2007 WL 1310097, at *3 (Kan. App. 2007) (unpublished opinion).

In making its findings, the district court found both parents had more than 3 years to comply with the court-ordered plan, and then stated both parents were unfit and their condition or conduct was unlikely to change in the foreseeable future. Here, evidence was presented that showed over the period of 3 years Father continued to test positive for illegal substances. Father even tested positive for ecstasy, methamphetamine, amphetamine, and THC during the trial. Father also failed to maintain suitable housing, as he moved several times during the case, was evicted from one home, and did not have running water in another. He also never turned in verification of employment. Father had 3 years to comply with the requirements and succeed in reintegration with P.T., but that

never happened. The court found that P.T. deserved permanency in a time that was reasonable to her. Based on what was foreseeable for Father, there was clear and convincing evidence to find that his condition would not change.

Each factor relied upon by the district court to demonstrate Father was unfit to parent P.T. was supported by clear and convincing evidence. The district court is affirmed.

Father next argues the district court abused its discretion by finding the termination of his parental rights to P.T. was in the best interests of the child.

Under K.S.A. 2015 Supp. 38-2269(a), the district court may terminate parental rights when the court finds by clear and convincing evidence that the parent is unfit and the conduct is unlikely to change in the foreseeable future. If the court makes this finding, the court then shall consider whether termination of parental rights is in the best interests of the child. K.S.A. 2015 Supp. 38-2269(g)(1). In making this determination, the court gives primary consideration to "the physical, mental and emotional health of the child." K.S.A. 2015 Supp. 38-2269(g)(1). "If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order." K.S.A. 2015 Supp. 38-2269(g)(1).

The district court is in the best position to make findings as to what is in the best interests of the child. *In re K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255 (2010). Therefore, "its judgment will not be disturbed in the absence of an abuse of judicial discretion." 44 Kan. App. 2d at 318. "A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact." *Northern Natural Gas Co. v. ONEOK Field Services Co.*, 296 Kan. 906, 935, 296 P.3d 1106 (2013).

15

Here, the district court found that Father was unfit to parent and his conduct was unlikely to change in the foreseeable future. Next, it found it was in P.T.'s best interests to terminate both Mother and Father's parental rights "because they are not now, nor will ever be, capable of providing the level of care sufficient for her emotional, physical, and psychological health."

P.T. had been in out-of-home placement since May 18, 2012. She had been with her foster family for a year and a half and they were willing to adopt her. P.T. did well with her placement and both of her siblings were placed there as well. In addition, she became very happy when the topic of a forever home with the foster family was discussed. When P.T. visited with her parents, she came back distressed, unhappy, struggled to sleep, and regressed in toilet training. When the visits with her parents ceased, P.T. was calm and acted like a normal child of her age. It is clear this decision was not arbitrary, unreasonable, or based on error, and it was made with the primary consideration of P.T.'s physical, mental, and emotional needs. The district court did not abuse its discretion and is affirmed.

Affirmed.